UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GREGORY REQUA,<br><br>        Plaintiff(s),<br><br>  v.<br><br>KENT SCHOOL DISTRICT No. 415;<br>BARBARA GROHE, SUPERINTENDENT; and<br>MICHAEL ALBRECHT, PRINCIPAL,<br><br>        Defendant(s). | NO. C07-759MJP<br><br>ORDER DENYING MOTION FOR<br>TEMPORARY RESTRAINING<br>ORDER |

Plaintiff, a senior at Kentridge High School, received a disciplinary suspension from the Kent School District. Following the exhaustion of his administrative remedies, Plaintiff filed this lawsuit alleging violations of his First Amendment rights and his constitutional right to due process of law. He also claims that the "long-term suspension" violated un-named regulations concerning school discipline. Complaint, pp. 6-7; Dkt. No. 1.

Concurrent with the filing of his complaint, Plaintiff also moved this Court for a Temporary Restraining Order (TRO) – based solely on his First Amendment claims – "enjoining Defendants from enforcing the long-term suspension during the course of this suit and ordering the Defendants to immediately re-instate Gregory at school..." Id. at p. 2. After reviewing the pleadings and all attached exhibits and hearing oral argument on the matter, the Court DENIES Plaintiff's TRO request.

ORDER ON
MTN FOR TRO - 1

**Background**

Plaintiff Gregory Requa is currently a senior at Kentridge High School and is over 18 years old. During his junior year, motion picture footage[1] was surreptitiously taken on at least two separate occasions of a teacher at his school (Ms. M.) and of her classroom. The raw video and audio footage was edited together, graphics and a musical soundtrack were added, and the results were posted on a popular Internet video posting site called YouTube.com. The completed product includes commentary on the teacher's hygiene and organization habits, and also features footage of a student standing behind the teacher making faces, putting two fingers up at the back of her head and making pelvic thrusts in her general direction. Additionally, in a section preceded by a graphic announcing "Caution Booty Ahead," there are several shots of Ms. M's buttocks as she walks away from the videographer and as she bends over; the music accompanying this segment is a song titled "Ms. New Booty." The Court takes judicial notice that "booty" is a common slang term for buttocks.

Plaintiff admits to posting a link to the YouTube.com location of this video at his own personal web page on MySpace.com in June 2006. School resumed in September and there is no allegation that the existence of the video became common knowledge or in any fashion disrupted the educational process at Kentridge. (In fact, the computers at the high school are configured to prevent accessing websites such as YouTube and MySpace.) But in February of 2007, a local Seattle news channel discovered the video while investigating a story about YouTube student postings critical of high school teachers. The reporter on the story contacted the Kentridge administration for comment, and on the night of February 14, 2007, a news segment was aired featuring the Ms. M. video and others. Plaintiff alleges that, upon learning of the news coverage and the possibility that the video could be

---

[1] The instrumentality of recording is unknown. Given the state of technology, the images could have been captured on a small, handheld video recorder or even a cell phone.

**ORDER ON
MTN FOR TRO - 2**

viewed as harassment, he removed the link to the video from his MySpace.com page. Declaration of Requa, ¶ 10.

In the meantime, the Kentridge principal, Defendant Albrecht, initiated an investigation to discover the persons responsible for the video. Working backward from the boy who was filmed standing behind Ms. M, he obtained the name of S.W., one of the students allegedly responsible for the filming. In the course of being interviewed, S.W. identified Plaintiff as also being involved in creating the video. S.W. gave the following written statement:

> About the last 5 days of school Greg Requa and I filmed [Ms. M.] without her consent and posted it online. Greg did editing and posted it online. All I did was some filming.

Defendants' Memo, App. B.

Defendant Albrecht also obtained the statements of four other students. Two of the statements identified Plaintiff as involved in the filming of the video (Def. App.'s C and E); the other two statements identified him as being involved, but do not specifically identify him as shooting any portion of the video (Def. App.'s D and F). The statements are hand-written, unsigned and lack any of the customary indicia of reliability (i.e., verification under penalty of perjury, etc.).

Plaintiff also submitted a written statement to the principal. In it, he denied any involvement in any aspect of filming, editing or posting the video. He admitted only to putting a link to the video on his MySpace.com page, a link which he removed upon learning that it might subject him to disciplinary sanctions.

On February 15, 2007, Defendant Albrecht sent letters (Def. App. G) to the parents of the students whom he had determined were responsible for the video. The letter to Plaintiff's parents advised that disciplinary action was being taken against Plaintiff in the form of a 40-day suspension, with 20 days "held in abeyance" if he completed a research paper while on suspension. Defendants assert (and Plaintiff has not controverted) that all the students deemed to be participants received the

**ORDER ON**
**MTN FOR TRO - 3**

same penalties. Plaintiff's family was also advised of their due process rights and the appellate procedures provided for in the Washington Administrative Code (WAC). Id.

Plaintiff requested a hearing and appeared before a hearing officer with his parents and attorney on March 9, 2007. At the hearing, none of the students who claimed that Plaintiff was involved in creating or posting the video appeared to testify, and Plaintiff was not advised of their identities.[2] The hearing officer found that the appropriate policies and procedures had been followed in issuing the discipline, and further found that the sanction imposed was in accordance with Kent School District policies and procedures and was commensurate with the nature of the offense. Pursuant to WAC 392-400-310, Plaintiff appealed to the Defendant school district's Board of Directors.

On April 25, 2007, the Board of Directors conducted an appellate proceeding which included viewing the video, reviewing the witness statements and hearing argument from the parties. At the conclusion of the hearing they notified Plaintiff that the suspension would be upheld. In their written report, issued on May 9, 2007, the Board made the following conclusions:

1. The Board finds that Greg's denial of his involvement is <u>not</u> credible. While Greg claimed at the hearing that his involvement was merely a rumor based on his reputation as a skilled video editor, the Board notes that in each witness statement the students said that Greg <u>told</u> them he was involved, not that it was a rumor around the school. Greg was also identified as involved by his accomplice, S.W., as having been involved in editing and posting the video.

2. The Board of Directors finds that the students who worked to produce this video did so in concert to surreptitiously record the teacher in an embarrassing and offensive manner, with the obvious intent of humiliating her by posting the video on a publicly-accessible website. The Board finds this to be a single enterprise in which the participants – regardless of their specific role – are equally culpable.

3. The Board notes that the handbook at Kentridge High School defines sexual harassment, in relevant part, as "activity and other verbal or physical conduct of a sexual nature" when "such conduct has the purpose. . . or the effect of creating an intimidating, hostile, or offensive work/learning environment. . . for other district employees. . ." (pages 25-26 of the Kentridge High School Student Handbook).

---

[2] WAC 392-400-315(2)(a)(ii) permits students to decline to appear at suspension hearings if they have an expectation or fear of retaliation. Defendants allege that the students who provided the statements were invited to testify at the administrative hearings and that all chose to exercise their rights not to appear. Def. Memo, p. 4, fn 2.

**ORDER ON**
**MTN FOR TRO - 4**

4. The Board of Directors finds that recording the two episodes discussed above, i.e.:
   a. The "pelvic thrust" gesture made from behind Ms. M. towards her body while she was unaware of the student's presence or that the video was being recorded; and
   b. The extended, close-up recording of Ms. M's buttocks, a personal and intimate part of the human body, while she walked and while she bent over, with the graphic "Caution Booty Ahead" on the screen and the previously mentioned musical background;
   both constitute activity or conduct of a "sexual nature" that create an intimidating, hostile, and offensive work environment for any teacher who might be subjected to such conduct by students made without their knowledge. Thus, the conduct of recording the teacher in this manner in the classroom falls under the student handbook's description of "sexual harassment."

5. The Board of Directors rejects the First Amendment challenge argued by Greg's legal counsel; the Board concludes that the discipline is appropriate and should be upheld based on the <u>conduct</u> of the students involved, i.e., secretly recording the teacher in at least two ways that constitute sexual harassment; and that such conduct that occurred on school grounds during class. The Board finds that the editing and posting of the video off-campus was, at best, incidental to the punishable conduct that occurred in the classroom. The punishment in this case is not for the purpose of regulating "speech" created off-campus.

6. The Board of Directors also notes that the Kentridge High School Student Handbook prohibits the use at school of "personal electronic devices" (including video recorders, cameras, and other personal electronic devices) and that Greg and his accomplices were in violation of this provision when they used an electronic device to record Ms. M in her classroom during class.

7. The Board of Directors concludes that the school acted appropriately in punishing the conduct mentioned above, and finds that the punishment (forty days, with twenty days held in abeyance) is consistent with the district's standards for the above-mentioned conduct.

Def. Memo, App. A, Kent School District Board of Directors Findings of Fact and Conclusions of Law, pp. 3-5.

Plaintiff began his suspension from regular classes on May 8, 2007. He was assigned to "contract school," an interim academic process in which Plaintiff works on his classroom assignments at home with the assistance of a staff tutor a few hours a week during school off-hours. If he completes the research assignment assessed as part of his discipline, he will be allowed to return to the regular school setting on June 6, in time for his graduation ceremony on June 16, 2007. By administrative regulation, the sanctions imposed against him may not be enforced in a manner which interferes with the achievement of his grade, subject or graduation requirements. WAC 392-400-235(1).

ORDER ON
MTN FOR TRO - 5

**Discussion**

**Standard for Preliminary Relief**

"This circuit's longstanding standard for a preliminary injunction is well known: The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. These standards are not separate tests but the outer reaches of a single continuum." Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001) (internal quotation marks and citations omitted). The court must also weigh whether the public interest favors issuance of the injunction. Southwest Voter Registration Ed. Project v. Shelley, 344 F.3d 914, 917 (9th Cir. 2003). Regardless of which test is used, the analysis "creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiff[] must convince the district court that the public interest and balance of hardships tip in [his] favor." Id. at 918.

The Court is mindful that what Plaintiff seeks here is a *mandatory* injunction; i.e., an order from this Court requiring Defendants to take positive steps to lift the suspension previously imposed. Courts are generally more cautious about issuing mandatory preliminary injunctions. Such relief is "subject to a heightened scrutiny and should not be issued unless the facts and the law *clearly favor the moving party*." Dahl v. HEM Pharm Corp., 7 F.3d 1399, 1403 (9th Cir. 1993) (emphasis added). A strong showing is required both as to the likelihood of success on the merits and the balance of harms. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2nd Cir. 1995).[3]

---

[3] Anticipating that Plaintiff's request could be characterized as either affirmatively requiring the Defendant district to reinstate Plaintiff (a mandatory injunction) or simply refrain from suspending him any further (a prohibitory injunction), the Court notes that the result in this case would be the same whether or not the analysis was conducted under the heightened mandatory injunction standard.

ORDER ON
MTN FOR TRO - 6

1   This heightened standard is further justified by the fact that, once entered, a preliminary
2   injunction in this matter cannot be undone.  Plaintiff is a senior at Kentridge High School who will
3   graduate on June 16, 2007 (less than a month from the date of this order).  At that point, the school
4   district loses the ability to discipline him further should their initial determination be upheld upon
5   review.  These temporal restrictions on Defendants' authority and the finality of this preliminary
6   decision render it imperative that Plaintiff be held to a high standard of proof before his requested
7   relief is granted.  Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156
8   (10th Cir. 1991); Tom Doherty Assocs., 60 F.3d at 34-35.

**Likelihood of success on the merits/irreparable injury**

The Court analyzes this "likelihood of success/irreparable injury" end of the TRO "continuum" from two perspectives: (1) the school district's defense that what was penalized here was conduct, not speech (which encompasses Plaintiff's assertions that (a) the district's claim that he was involved was a pretext for punishing his exercise of his First Amendment rights and (b) he was not involved in the creation of the video); and (2) Plaintiff's alternate theory that "even if the school district can prove Gregory's involvement in the production and/or posting of this video. . . the video is protected speech."  Pltf Memo, p. 11.

School district's defense

The Defendants have taken the position that what is being punished here is Plaintiff's conduct (specifically, secretly filming the teacher in class), not his off-campus activities.  Concerning the possibility that the Defendants' position is pretextual, the Court finds that there is little to no likelihood of Plaintiff prevailing on this theory.  Plaintiff has presented no evidence (other than his argument that the evidence of his involvement is insufficient) that the district's reasons for punishing him are pretextual.  In fact, the evidence is to the contrary.

ORDER ON
MTN FOR TRO - 7

The evidence before the Court establishes that, of the three students involved in the creation of the video, Plaintiff is the only one who created a link to the YouTube video posting. Indeed, the evidence believed by the school authorities (including S.W.'s statement) indicated that Plaintiff was responsible for filming, editing and posting the footage (the latter two activities occurring outside of school property). Despite the considerable off-campus activity of which the school district believed Plaintiff to be culpable, all of the students involved in the activity received the same sanction. The implication is that all three were being punished for the same thing: i.e., the secret, in-class filming of the teacher.

Nor is there any other evidence that might suggest that Plaintiff is being singled out for anything other than the classroom activity of which he was accused. The district did not demand that he remove the YouTube link from his web page (in fact, he removed the link of his own volition), nor did his punishment include a prohibition against re-posting the link at any point. Plaintiff's own counsel indicated at oral argument that Plaintiff was only one of several students who posted a link to the YouTube video, yet there was no evidence adduced that any of the other students who posted a link to the video were sanctioned in any fashion. Neither was there any indication that the administrators of the YouTube website were approached about removing the video; all parties were in agreement that the video is still in existence at YouTube.com. In short, there is no evidence to support the theory that the reasons given for the discipline imposed by the Defendant district were a pretext for an underlying desire to punish Plaintiff for exercising his rights to free speech away from campus.

Regarding the possibility that the school district sincerely believes that Plaintiff was involved in the classroom filming of the video and is simply wrong in its belief, the nature of the district's findings leads the Court again to the conclusion that Plaintiff is unlikely to succeed on the merits of his First Amendment claims (which were the sole basis for his TRO motion). The Board of Directors' findings

state their conclusion that "the discipline is appropriate and should be upheld based on the <u>conduct</u> of the students involved. . . [T]he editing and posting of the video off-campus was, at best, incidental to the punishable conduct that occurred in the classroom. The punishment in this case is not for the purpose of regulating 'speech' off-campus." Def App. A, ¶ 5 (emphasis in original).

The Court feels constrained to observe that the quality of proof regarding Plaintiff's involvement in the creation of this video was far below a standard that would pass muster in a courtroom. The school administration relied on unsigned and unsworn (and occasionally unclear) statements from anonymous students whom they could not produce for examination during the course of the hearings conducted on this issue. At the same time, the Court recognizes that school officials are bound by administrative regulations which diverge sharply from the strict legal requirements of courtroom proof. Furthermore, schools must balance a multitude of daily disciplinary situations against considerations of due process in an environment that little resembles the measured and thoughtful atmosphere of a courtroom.

The poor quality of the district's evidence avails Plaintiff nothing, however. His total denial of any involvement in the creation of the video, coupled with the purely First Amendment focus of his request for a TRO, force him to argue that it is his off-campus, post-production activity that is the basis for his punishment. All parties are in agreement that his posting of the link to the YouTube video is protected speech, and (as discussed above) the Court finds inadequate evidence that the punishment meted out by Defendants is a pretext for sanctioning that activity. Thus, the Court is satisfied that the nature of the Board's findings represent their actual reason for disciplining Plaintiff, and the likelihood of Plaintiff proving otherwise is too small to warrant extraordinary injunctive relief. That the Board's conclusions regarding Plaintiff's involvement may be found arbitrary or capricious or clearly erroneous upon review is a matter for another day and another court.

<u>Plaintiff's protected speech</u>

ORDER ON
MTN FOR TRO - 9

1   Although Plaintiff steadfastly denies any involvement in the video's creation, he argues

2   alternatively that "even if the school district can prove [his] involvement in the production and/or

3   posting of this video. . . the video is protected speech." Pltf Memo, p. 11.  The Court turns to his

4   likelihood of success on the merits of this theory.

5   The intersection of a student's right to free speech and a school's right to maintain an

6   environment conducive to education has produced a wealth of jurisprudence.  For purposes of this

7   motion, the landmark cases are <u>Tinker v. Des Moines Independent School District</u>, 393 U.S. 503

8   (1969), and <u>Bethel School District v. Fraser</u>, 478 U.S. 675 (1988).  The holdings of these cases can be

9   applied to the facts before this Court and under either of their rationales the filming of the footage at

10  issue here does not constitute "protected speech" activity.

11  The <u>Fraser</u> case concerned the punishment of a student for graphic sexual references during the

12  course of a speech given at a school assembly.

13  > This Court's First Amendment jurisprudence has acknowledged limitations on the otherwise
    > absolute interest of the speaker in reaching an unlimited audience where the speech is sexually
14  > explicit and the audience may include children.. . . These cases recognize the obvious concern
    > on the part of parents, and school authorities acting *in loco parentis*, to protect children. . .
15  > from exposure to sexually explicit, indecent, or lewd speech.

16  478 U.S. at 684 [citations omitted].

17  Plaintiff's attempt to characterize the entirety of the video as "criticism" of Ms. M. is

18  unpersuasive.  There are portions of the piece which are intended to highlight and comment upon the

19  disorganized state of her classroom (including the clutter on her desk and shelves and the pieces of

20  chalk littering her classroom floor) and upon the teacher's hygiene.   Those portions of the video

21  featuring (1) footage of a student making "rabbit ears" and a pelvic thrust behind her back, and (2)

22  footage of her buttocks accompanied by graphics stating "Caution Booty Ahead" and a "booty" rap

23  song, however, cannot be denominated as anything other than lewd and offensive and devoid of

24

25

26  **ORDER ON**
    **MTN FOR TRO - 10**

political or critical content. The Court does not find Plaintiff's counsel's contention that footage of the teacher's backside is somehow a critique of her hygiene to be persuasive.

This Court agrees with the Fraser Court that "the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as [this] would undermine the school's basic educational mission." Id. at 685. The facts of this case are not on all fours with Fraser in the sense that the "speech" at issue here was ultimately published in an off-campus location (i.e., the internet). But an inseparable part of the speech which Plaintiff seeks to protect is the filming of the footage in the classroom. That is an inextricable part of the activity which comprises the "speech" of the completed video and, in singling out that discreet portion of the "speech" for punishment, Defendants have localized the sanctionable behavior to the area in which their authority has been upheld by the Supreme Court.

Tinker v. Des Moines Independent School District has been called the "magna carta of students' expression rights."[4] It is also the "catch-all" case for student speech issues in the sense that speech falling outside of the categories covered by Fraser and other "student free speech" situations will be analyzed under the general rule announced in Tinker. Saxe v. State College Area School District, 240 F.3d 200, 214 (3rd Cir. 2001). That general rule is: students may engage in activities at school that convey their ideological viewpoints unless such activities "materially and substantially disrupt the work and discipline of the school" or interfere with the rights of others. 393 U.S. 503, 513.

The Court has no difficulty in concluding that one student filming another student standing behind a teacher making "rabbit ears" and pelvic thrusts in her direction, or a student filming the

---

[4] Martha McCarthy, Ph.D., *Student Expression Rights: Is a New Standard on the Horizon?*, 216 Ed.Law.Rep. 15 (2007).

ORDER ON
MTN FOR TRO - 11

1  buttocks of a teacher as she bends over in the classroom, constitutes a material and substantial
2  disruption to the work and discipline of the school. Plaintiff argues that, since the filming occurred in
3  the last week of school when no real "learning" takes place anyway, this sort of activity cannot be
4  considered disruptive to a "learning environment." This reads the Tinker rule too narrowly. The
5  school district is not required to establish that an actual educational discourse was disrupted by the
6  student's activity. The "work and discipline of the school" includes the maintenance of a civil and
7  respectful atmosphere toward teachers and students alike – demeaning, derogatory, sexually
8  suggestive behavior toward an unsuspecting teacher in a classroom poses a disruption of that mission
9  whenever it occurs.

10       Finally, as the Board's findings point out, the activity in question violates elements of the
11  school's conduct code as articulated in the Kentridge High School Student Handbook. "Sexual
12  harassment" is defined as "verbal or physical conduct of a sexual nature. . . when. . . [s]uch conduct
13  has the purpose or affect of unreasonable interference with an individual's job performance. . . or the
14  affect of creating an intimidating, hostile, or offensive work/learning environment." Def App. H, pp.
15  25-26. Students are further prohibited from having their cell phones (some of which have the
16  capability of capturing motion pictures and audio) turned on during school hours or from possessing
17  any other "personal electronic device" such as video recorders and cameras. Id. at 27, 29.

18       All of these restrictions are consistent with Tinker's recognition of the school's right to
19  maintain a "disruption-free" educational environment. The creation of this video violates at least two
20  out of the three cited prohibitions (depending on how the images were recorded) and the First
21  Amendment does not extend its coverage to disruptive, in-class activity of this nature. The Court finds
22  Plaintiff's likelihood of success on the merits of a Fraser or Tinker "protected speech" argument to be
23  extremely small.

24
25
26  **ORDER ON
    MTN FOR TRO - 12**

Irreparable injury

The second prong at this end of the "TRO continuum" concerns the existence of "irreparable injury" to the moving party; i.e., injuries which cannot be fairly compensated by monetary damages or other forms of relief.

The Court finds that Defendants' actions have subjected Plaintiff to certain irreparable injuries. First is the denial of a full-time, in-class educational experience for this young man. While the district's "contract school" alternative does provide Plaintiff with the means to continue his education, it is no substitute for the depth of learning and the level of attention that he would receive as a full-time student attending all his classes. Second is the injury represented by Plaintiff's inability to meaningfully participate in the final months of his senior year of high school. There are a host of activities and experiences associated with this milestone in a young adult's life and they are non-compensable in the sense that they can never be re-created and Plaintiff will never pass this point again.

But weighed against the findings concerning the unlikelihood that Plaintiff will prevail on the merits of his claim, the Court concludes that the injuries to Plaintiff, however irreparable, are insufficient to compel the extraordinary remedy which he seeks.

**Serious questions/balance of hardships**

Plaintiff faces a significant lack of certainty on the part of this Court that he will prevail on the merits of his First Amendment claim. In the face of that uncertainty, he bears an even heavier burden of convincing the Court that "the public interest and balance of hardships tip in [his] favor." SW Voter Registration Ed. Project v. Shelley, 344 F.3d at 918.

Serious questions

The Court considers issues of protected speech under the First Amendment to be highly significant and takes issues of protected speech very seriously. For purposes of injunctive relief

analysis, however, "serious questions," while they need not "promise a certainty of success... must involve a 'fair chance of success on the merits.'" Republic of Philippines v. Marcos, 862 F.2d 1366, 1362 (9th Cir. 1988) (citations omitted). As indicated in the analysis above, the Court does not consider the likelihood of Plaintiff prevailing on the merits of his claim to be even "fair."

Balance of hardships

Plaintiff has already endured some impact as a result of the sanctions imposed by the Defendant district. Probably the most significant is the loss of his ability to participate in a national academic competition which could have brought him both acclaim and scholarship awards. Complaint, ¶ 22; Pltf Memo, p. 2. Counsel for Plaintiff appeared to argue at the hearing on this motion that this impact should somehow factor into his side of the "hardship/irreparable injury" equation. To the extent that this was intended, the Court rejects this argument. Setting aside the purely speculative nature of the argument that Plaintiff would have won anything in later competitions, he "must demonstrate immediate threatened harm." See Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988). The analysis demands a prospective, not a retrospective, examination of injury.

The harm which is threatened to Plaintiff has been enumerated in the discussion of "Irreparable injury" above; namely, loss of the benefits of a full-time, in-class education and loss of the experiences associated with the final months of high school. This hardship is somewhat mitigated by the district's commitment to holding 20 days of Plaintiff's suspension in "abeyance" upon his completion of a research paper. To this extent, Plaintiff holds the "key to his cell" and can foreshorten the negative impacts of Defendants' sanction. The Court rejects the contention of Plaintiff's counsel (put forward at oral argument) that completion of this essay somehow constitutes an admission of guilt on Plaintiff's part. It is simply an optional portion of the discipline he received and there is nothing explicitly or implicitly inculpatory about it. If Plaintiff wishes to return to school in time to participate in his graduation, he must write a paper.

ORDER ON
MTN FOR TRO - 14

1   Turning to the hardships threatened to Defendants if the injunctive relief is granted, the Court
2   finds that the balance tips in their favor. As mentioned in the portion of the discussion concerning the
3   standards of proof for preliminary injunctive relief, Defendants are temporally limited in their ability to
4   sanction Plaintiff. As of June 16, 2007, the school district will lose the ability to impose any penalties
5   on Plaintiff and their ability to enforce their code of student conduct will be diminished accordingly.
6   The Court must view the hardships to Defendants in the light of the possibility that Defendants will
7   ultimately prevail and, viewed from that perspective, the fact that Plaintiff will move beyond the ability
8   of the school district to sanction him represents an inequity on multiple levels.

9   The first is the inequity that will result from the fact that the other participants in the video will
10  have been held fully accountable while Plaintiff was not. Possibly even more significant is the second
11  consequence, which is that Defendants' inability to fully discipline Plaintiff (with its implication that
12  they had no right to do so) will "undermine the community message that the sanctions are meant to
13  communicate." Def Memo, p. 11. The deterrent impact of the consequences meted out for the
14  violations of the student conduct code will be lost, raising the likelihood of a corresponding loss of
15  respect and adherence to the code itself. The potential hardships to Defendants outweigh those which
16  Plaintiff can claim.

**Public interest**

18  The court must also weigh whether the public interest favors issuance of the injunction. <u>SW
19  Voter Registration Ed. Project v. Shelley</u>, 344 F.3d 914, 917 (9th Cir. 2003). Where the public
20  interest is involved, it is necessary to determine whether that interest favors the moving or nonmoving
21  party. <u>Sammartano v. First Judicial District Court In & For the County of Carson City</u>, 303 F.3d 959,
22  974 (9th Cir. 2002).

23  The Court finds that this matter does implicate the public interest, and further finds that on
24  balance the public interest favors the Defendants. Certainly the First Amendment rights of students

ORDER ON
MTN FOR TRO - 15

are of vital importance, but a thorough review of the facts of this matter reveals that, to the extent that Plaintiff has raised legitimate First Amendment considerations (i.e., his right to protected off-campus activity expressing his viewpoints), those rights have been recognized and endorsed by all parties involved. The Court is satisfied, based on the Board of Directors' written findings, that the Defendant district understands and respects that students must be allowed to engage in free expression and dissemination of their viewpoints, even when those viewpoints are uncomfortable, unpopular, or uncouth.

Indeed, the ability of students to critique the performance and competence of their teachers is a legitimate and important right, one that should not only be tolerated but encouraged by the schools whose mission is to educate them. It is hoped that Defendants will seek ways to provide opportunities for the students entrusted to them to voice their opinions regarding the effectiveness of the district's faculty, understanding that the students' rights in this regard must be balanced against the schools' primary responsibility to provide safe and supportive learning and working conditions for students and faculty alike.

The public also has a deeply vested interest in the creation and maintenance of an educational system where teachers can practice their vitally important craft in an environment free from harassment, lewdness and inappropriate behavior. The student conduct code promotes such an atmosphere. The public's interest in the school district's ability to maintain a working and learning environment where violations of those legitimate expectations are sanctionable favors Defendants' position and the denial of the requested restraining order.

**Conclusion**

ORDER ON
MTN FOR TRO - 16

A temporary restraining order is an extraordinary remedy which is granted only sparingly. The issues presented here are important. A student's right to criticize his or her teachers is a right secured by the Constitution. A school district's interest in maintaining an environment that is helpful and not harmful to learning is also important.

Here the balance of interests tips in favor of the school district. Plaintiff has failed to meet the criteria for the granting of a TRO. He is not likely to prevail in establishing that the classroom conduct of which he is accused is subject to First Amendment protection. His admitted free speech activities outside the classroom – posting a link to the YouTube video on the internet – are protected speech and the school district agrees that he may not be disciplined for this out-of-school expression of his viewpoint. But Plaintiff has failed to establish or raise serious questions that his punishment is for his protected free speech and not for the classroom conduct of which he is accused.

Therefore, the request for a TRO is DENIED.

The Clerk of the Court shall provide copies of this order to all counsel.

Dated: May 22, 2007

Marsha J. Pechman
U.S. District Judge

ORDER ON
MTN FOR TRO - 17